# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**CARLEAN DATES**, *et al.*,

      **Plaintiffs,**

    **v.**

**HSBC**, *et al.*,

      **Defendants.**

**Case No. 1:24-cv-81**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Carlean Dates and Malik Ali (Dates's husband) seek a temporary restraining order (TRO) preventing them from being removed from "their" house located at 12062 Hazelhurst Drive, Cincinnati, Ohio, 45240 (the Hazelhurst property). The Court uses quotations because, while it is admittedly the house in which they reside, it is not their house. Rather, as a result of actions taken under a state court foreclosure order and in particular a 2018 Sheriff's sale pursuant to that order, the house now belongs to HSBC, the assignee of the mortgage note on the property, who has told Dates to leave. But, like a modern-day Bartleby, Dates (and her husband) would prefer not to.

To thwart HSBC's efforts to foreclose and to obtain possession, she has filed for bankruptcy—five times. Those filings ultimately resulted in an order from that court imposing a two-year ban on her filing in bankruptcy due to her abuse of the system. She also sued the bankruptcy judge and trustee from the most recent bankruptcy action in both their individual and official capacities, in this Court, essentially for little more than the fact they rejected her claims. That unsuccessful suit recently resulted in this Court (via the undersigned) dismissing Dates's

complaint as legally frivolous and warning her that similar conduct in the future would subject her to sanctions. And earlier this month, the state court, which already had held her in contempt for refusing to vacate the property on January 5, 2023 (and perhaps emboldened by the bankruptcy court's imposition of sanctions), amended its contempt order to authorize the Sheriff to forcibly evict her, any other occupants, and any personal property remaining on the premises on or after February 29, 2024.

Undeterred by an unbroken nearly ten-year string of adverse determinations finding that Dates has no remaining property interest in the home, Plaintiffs responded with the instant action. They now claim that, in seeking foreclosure and eviction, HSBC has violated various federal laws, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), 12 U.S.C. § 5301 *et seq.*, and the civil Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (Compl., Doc. 3, #17–24). And given their impending eviction, they also sought the TRO that is the subject of this Opinion and Order. (Mot. for TRO, Doc. 2). (The Court notes that the TRO, to be effective, would need to be directed at either the Ohio court system (which authorized the eviction) or the Sheriff (who will carry it out under the state court order), neither of whom is a party to this action.)

As explained below, the Court concludes for a host of reasons—including, but certainly not limited to, the *Rooker-Feldman* doctrine and the Anti-Injunction Act— that Plaintiffs have little, if any, chance of success on the merits of their claims and that, even if they did, a TRO directed at HSBC would provide them no relief.

Accordingly, the Court **DENIES** Plaintiffs' Motion for Temporary Restraining Order (Doc. 2).

## BACKGROUND[1]

The case had humble beginnings in a simple foreclosure action that HSBC initiated in 2012 in the Hamilton County Court of Common Pleas (Docket No. A 1200734). *Case Summary – HSBC Bank USA NA as Trustee for the Certificate vs. Carlean Dates*, Hamilton Cnty. Clerk Cts., https://perma.cc/A9CF-JAGB [hereinafter *Foreclosure Action*]. As the assignee of a mortgage note hypothecated by the Hazelhurst property, HSBC sought to foreclose on the note when Dates defaulted, (Doc. 3, #20–21). *Dates v. HSBC Bank USA, N.A.* (*Dates XV*), No. 1:19-cv-445, 2020 WL 7253301, at *1 (S.D. Ohio Dec. 10, 2020). This sparked a whirlwind of litigation, including the opening of over a dozen federal dockets (listed in the footnote below)— all of which have resulted in the courts either dismissing her actions or rejecting her attempts to claim an ownership interest in the Hazelhurst property, largely because these federal courts have found that the state court foreclosure proceeding conclusively determined that HSBC was entitled to its mortgage note and (later) to the title it obtained at the Sheriff's sale.[2]

---

[1] Although the case comes before the Court on just the Complaint and the request for a TRO, the Court "may take judicial notice of proceedings in other courts of record," *Granader v. Pub. Bank*, 417 F.2d 75, 82 (6th Cir. 1969), as well as take "judicial notice of the public records pertaining to the [Hazelhurst] property," *Cotton v. City of Cincinnati*, No. 1:11-cv-389, 2013 WL 1438030, at *2 (S.D. Ohio Apr. 9, 2013); *accord Perkins v. Lakeview Loan Serv., LLC*, No. 2:22-cv-10563, 2024 WL 100168, at *2 (E.D. Mich. Jan. 9, 2024). Indeed, Plaintiffs' counsel offered that same observation at the hearing on the TRO motion.

[2] *Dates v. Buchanan* (*Dates XVIII),* No. 1:23-cv-449 (S.D. Ohio July 18, 2023) (Cole, J.); *In re Dates* (*Dates XVII*), No. 1:23-bk-10007 (Bankr. S.D. Ohio Jan. 5, 2023); *Dates v. HSBC Bank*

3

Dates began her federal court odyssey by filing her first bankruptcy action on August 20, 2012, while the state court foreclosure proceeding was still pending. *Dates I* (Case No. 1:12-bk-14507; Doc. 1). Although this resulted in the entry of an automatic stay of the underlying foreclosure proceedings under 11 U.S.C. § 362, HSBC sought, and the bankruptcy court granted, relief from that stay several months into the proceeding. *Dates XV*, 2020 WL 7253301, at *1 (citing Mar. 19, 2013, Order Granting Motion for Relief from Stay, *Dates I* (Case No. 1:12-bk-14507; Doc. 130)). HSBC then successfully obtained a judgment of foreclosure in its favor in the state foreclosure action on January 29, 2014. (*Id.*). In the Ohio state court system, Dates did not appeal the foreclosure order outright; rather she sought to appeal her later denied motion for a retrial of those state court foreclosure proceedings. But the appeals court dismissed that appeal on September 25, 2014, for disregarding the Ohio Rules of Appellate Procedure. *Foreclosure Action*, *supra* (Sept. 25, 2014, "Entry of Dismissal (C 1400249)"). She never sought direct review in the Ohio Supreme Court.

---

USA, N.A. (*Dates XVI*), No. 1:19-cv-446 (S.D. Ohio June 11, 2019) (Cole, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates XV*), No. 1:19-cv-445 (S.D. Ohio June 11, 2019) (Cole, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates XIV*), No. 1:19-ap-1011 (Bankr. S.D. Ohio Feb. 19, 2019); *In re Dates* (*Dates XIII*), No. 1:18-bk-14602 (Bankr. S.D. Ohio Dec. 21, 2018); *Dates v. HSBC Bank USA, N.A.* (*Dates XII*), No. 1:18-ap-1070 (Bankr. S.D. Ohio Nov. 13, 2018); *In re Dates* (*Dates XI*), No. 1:18-bk-13150 (Bankr. S.D. Ohio Aug. 21, 2018); *Dates v. HSBC Bank USA, N.A.* (*Dates X*), No. 1:17-cv-842 (S.D. Ohio Dec. 15, 2017) (Barrett, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates IX*), No. 1:17-cv-634 (S.D. Ohio Sept. 21, 2017) (Barrett, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates VIII*), No. 1:17-cv-535 (S.D. Ohio Aug. 14, 2017) (Cole, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates VII*), No. 1:16-cv-1037 (S.D. Ohio Oct. 28, 2016) (Dlott, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates VI*), No. 1:16-ap-1052 (Bankr. S.D. Ohio Sept. 12, 2016); *In re Dates* (*Dates V*), No. 1:16-bk-12410 (Bankr. S.D. Ohio June 28, 2016); *In re Dates* (*Dates IV*), No. 14-8034 (BAP 6th Cir. June 5, 2014); *Dates v. HSBC Bank USA, N.A.* (*Dates III*), No. 1:13-cv-376 (S.D. Ohio June 3, 2013) (Barrett, J.); *Dates v. HSBC Bank USA, N.A.* (*Dates II*), No. 1:13-cv-291 (S.D. Ohio May 1, 2013) (Barrett, J.); *In re Dates* (*Dates I*), No. 1:12-bk-14507 (Bankr. S.D. Ohio Aug. 20, 2012).

Undaunted by that state-court loss, Dates renewed her efforts in the bankruptcy courts by serially filing bankruptcy actions there. Although the (new) automatic bankruptcy stays associated with those filings temporarily stymied HSBC, it eventually succeeded in enforcing the foreclosure judgment via sale of the Hazelhurst property at auction. More specifically, in Dates's third bankruptcy proceeding, the bankruptcy court granted HSBC's motion for relief from the stay, and in doing so, it expressly noted that HSBC was "entitled to <u>in rem</u> relief due to [Dates's] serial filings." Oct. 9, 2018, Order Granting Motion of HSBC for Relief from Stay with Request for In Rem Relief at 2, *Dates XI* (Case No. 1:18-bk-13150; Doc. 26). Under this *in rem* relief, the bankruptcy court held that beginning on October 9, 2018,

> [t]he automatic stay shall not apply to the [Hazelhurst] property for a period of two years as long as [HSBC], its successors and assigns hold the note and mortgage … except that [Dates as] a debtor in a subsequent case under th[e] [Bankruptcy Code] may *move for relief from such order* based upon changed circumstances or for good cause shown, after notice and a hearing.

*Id.* (emphasis added). In other words, the Hazelhurst property would not be subject to the automatic stay in bankruptcy from October 9, 2018, until October 9, 2020, even if it were claimed as property of a future bankruptcy estate, unless and until the debtor sought an order from the bankruptcy court affirmatively staying in rem actions over the Hazelhurst property.

True, Dates responded by launching a new bankruptcy proceeding on December 21, 2018 (her fourth), hoping to take advantage of a new automatic stay. *Dates XIII* (Case No. 1:18-bk-14602; Doc. 1). But HSBC, relying on the October 9, 2018, bankruptcy order providing no such automatic stay would occur, obtained an

Order for Sale from the state court. *Foreclosure Action*, *supra* (Dec. 27, 2018, "Order for Sale Returned and Filed"). The Sheriff then sold the property at auction on December 27, 2018. *Id.* (March 26, 2019, "Amended Judgment Entry Confirming Sheriff's Sale and Ordering Distribution"). The state court entered an order affirming the sale and identifying HSBC as the buyer who was entitled to title on March 26, 2019. *Id.* Dates again appealed, but the appeals court sua sponte dismissed that action for failure to prosecute. *Id.* (July 17, 2019, "Entry of Dismissal (C 190187)"). And again, she declined to seek direct review from the Supreme Court of Ohio. Meanwhile, the Hamilton County Recorder's Office recorded HSBC's deed to the Hazelhurst property on April 15, 2019. *Sheriff's Deed*, Hamilton Cnty. Recorder's Office (Apr. 15, 2019), https://perma.cc/44UW-X9YH.

Despite no longer holding title to, or any other interest in, the property, Dates refused to leave. The state court issued multiple Orders for Possession, which Dates ignored. Finally, on December 20, 2022, HSBC moved in state court for an order holding Dates in contempt on account of her refusal to vacate the property when an HSBC representative and two police officers visited the property on December 16, 2022. *Foreclosure Action*, *supra* (Dec. 20, 2022, "Plaintiff's Motion for Contempt with Contempt Hearing Scheduled by the Court for 1/5/23 @11:00"). After a hearing, on January 5, 2023, the state trial court held Dates in contempt, ordered her to vacate the premises, and authorized the Sheriff to use force in the event she did not comply. *Id.* (Jan. 5, 2023, "Order Finding Defendant Carlean Dates Is in Contempt of Court"). But, again seeking delay, Dates responded, not by appealing, but by re-traipsing her

well-trodden path to the bankruptcy court and filing a new action for bankruptcy protection that same day. *Dates XVII*, 2024 WL 120028, at *1. As the two years had elapsed on the October 2018 bankruptcy court order granting HSBC in rem relief from the automatic stay regarding the Hazelhurst property, this new bankruptcy filing once again resulted in an automatic stay. And based on that stay Dates managed to remain for another year in a house she no longer owned. But that all came to an end on January 5, 2024, when the bankruptcy court, citing the vexatious and harassing litigation behavior that Dates had perpetrated over multiple years and through multiple bankruptcies, dismissed the bankruptcy action as an abuse of the judicial process and sanctioned Dates. This time it barred her from filing any further bankruptcy actions for the next two years. *Id.*

Leaving out for the moment the five mandamus actions Dates filed in the Ohio Supreme Court (which led that court also to declare her a vexatious litigator, *State ex rel. Dates v. Hamilton Cnty. Courthouse*, No. 2022-1478, 203 N.E.3d 717 (Ohio Feb. 22, 2023) (table)) and the above-mentioned, recently dismissed suit in this Court in which she sued the bankruptcy judge and trustee on frivolous claims, *Dates XVIII*, No. 1:23-cv-449, 2024 U.S. Dist. LEXIS 30485 (S.D. Ohio Feb. 22, 2024), that brings us to the current suit. Given that no other bankruptcy stays are (or will be put) in place, final action on HSBC's attempt to take possession of the property it has owned for nearly five years appears imminent. On February 15, 2024, the state court, after being notified of the dismissal of Dates's most recent bankruptcy action and the corresponding sanctions, amended its January 5, 2023, contempt order and

reaffirmed its decision to hold Dates in contempt for continuing to squat on HSBC's property. *Foreclosure Action*, *supra* (Feb. 15, 2024, "Amended Order Finding Defendant Carlean Dates Is in Contempt of Court"). It also ordered that Dates, any occupants, and any personalty be removed from the Hazelhurst property by February 29, 2024, and authorized the Sheriff to use force to evict her and any others violating the contempt order should the house still be occupied after that date. *Id.*

Dates remains unconvinced she must go. On February 22, 2024, Dates (represented by counsel for the first time in this saga) and Ali sued HSBC in this Court. They raise four claims:

> (1) a claim that Defendants violated the purported bankruptcy stay (not actually entered when she filed *Dates XIII*) when Defendants moved forward with the December 27, 2018, Sheriff's sale, (Doc. 3, #17–22);

> (2) a claim that Defendants violated Dodd-Frank and its implementing regulations by enforcing an invalid mortgage allegedly issued without consideration of Dates's ability to repay the corresponding loan (what statutory provisions HSBC allegedly violated remain a mystery, as the Complaint does not identify them with any meaningful specificity),[3] (*id.* at #22–23);

> (3) a claim that Defendants violated civil RICO apparently based on the mere fact that HSBC initiates foreclosures across the country, (*id.* at #23); and

> (4) a fraud claim based on Plaintiffs' belief that the mortgage and promissory note were invalid and because they are convinced Dates was reconveyed the property in 2020, (*id.* at #23–24).

---

[3] Admittedly, Plaintiffs cite an entire collection of regulations in the Complaint. (Doc. 3 ¶ 42, #21 (citing 12 C.F.R. Par 1026); Doc. 9, #52 (citing all of "Regulation Z")). But citing an entire part of the regulatory code is not going to cut it. By failing to "specify the provision or provisions of the [regulations], if any, that [HSBC] allegedly violated, or any facts pertaining to [such] a violation," Plaintiffs have not come anywhere close to demystifying how HSBC can be held liable for contravening Dodd-Frank. *Rogers v. Horwitz*, No. 1:20-cv-02568, 2023 WL 6383796, at *19 (N.D. Ohio Sept. 29, 2023).

Plaintiffs simultaneously moved for a TRO. (Doc. 2). The motion engaged in no legal analysis and instead highlighted that eviction was "immanent [sic]" and that Dates and her husband were entitled to temporary equitable relief based on the allegations in the unverified Complaint. (*Id.* at #14). The motion suggested that the TRO requested, which is to "stop [Plaintiffs'] immanent [sic] removal from the[] [Hazelhurst] property," should extend until "April 1, 2024," which is 31 days from now. (*Id.*). The Court held an informal telephone conference with the parties (at which counsel for Plaintiffs and two attorneys for HSBC appeared) on February 26, 2024, in which the Court authorized an expedited briefing schedule. (2/26/24 Min. Entry). HSBC opposed the TRO by the Court's February 28, 2024, 5:00 p.m. deadline, (Doc. 8), and Plaintiffs replied the same evening, (Doc. 9). The Court then heard argument the next day (today), February 29, 2024, at 10:00 a.m. (2/29/24 Min. Entry).

The matter is ripe for the Court's review.

## LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy that should only be granted if the movant can clearly show the need for one." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008). Ultimately, "the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Plaintiffs "bear[] the burden of establishing entitlement to a temporary restraining order." *Mesa Indus., Inc. v. Charter Indus. Supply, Inc.*, No. 1:22-cv-160, 2022 WL 1044720, at \*4 (S.D. Ohio Apr. 7, 2022). "To satisfy this burden,

[Plaintiffs] must establish [their] case by clear and convincing evidence." *Id.* And that in turn means that Plaintiffs "may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-52, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (collecting cases).

Whether a movant is entitled to this extraordinary relief is governed by the same four factors that apply to preliminary injunctions. *See Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Those factors are: (1) whether the movant has a substantial likelihood or probability of success on the merits; (2) whether the movant will suffer irreparable injury if the relief is not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether the public interest would be served by issuing the injunctive relief. *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). The failure to meet the likelihood of success prong of the analysis is not dispositive. *Id.* at 1270. But if it is lacking, preliminary equitable relief is permissible only if there are at least "serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if a[] [TRO] is issued." *Id.* (quoting *Friendship Materials Inc. v. Mich. Brick, Inc.*, 947 F.2d 100, 105 (6th Cir. 1982)).

## LAW AND ANALYSIS

The issues with the motion and the complaint are numerous and, given the time constraints imposed by the relief Plaintiffs seek, the Opinion and Order cannot exhaustively address all of them. Instead, the Court endeavors to identify below the

most salient reasons Plaintiffs lack any meaningful likelihood of success on the claims they raise and therefore do not merit temporary injunctive relief.

Before turning to the merits, though, the Court starts, as it must, with subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998). Multiple problems exist on that front, which the Court may address in the order it pleases. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

The first, and biggest, problem is that the Court lacks Article III jurisdiction to entertain the injunctive relief requested here because Plaintiffs lack standing to pursue the equitable relief they demand. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (explaining that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek"). As explained above, the order that requires Dates and any other occupants of the Hazelhurst property to vacate is a Hamilton County Court of Common Pleas contempt order directing the Hamilton County Sheriff's Office to take forcible action with respect to any squatters who remain at the Hazelhurst property tomorrow. *Foreclosure Action*, *supra* (Feb. 15, 2024, "Amended Order Finding Defendant Carlean Dates Is in Contempt of Court"). That means the impending harm of which Plaintiffs complain (removal from the property) results from the state court's entry of the contempt order coupled with the Sheriff's anticipated actions under it. Neither of these are actions that HSBC has undertaken or will undertake. That is, HSBC is not authorized to evict Plaintiffs, and the Sheriff is doing so at the state court's command, not HSBC's, so enjoining HSBC accomplishes nothing. Rather,

providing Plaintiffs the relief they seek would require an order enjoining the *Sheriff* from executing the state court contempt order. But neither the Sheriff's Office, nor any individual law enforcement officer likely to execute the contempt order, nor the Hamilton County Court of Common Pleas is a party to this action.

That poses an insurmountable standing problem on redressability grounds. As the Eleventh Circuit explained, "[i]f a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable. [A] district court [i]s without jurisdiction to enjoin the lone defendant in this action, much less the nonparty [Sheriff's Office]." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020); *cf. Terves LLC v. Yueyang Aerospace New Materials Co.*, No. 1:19-cv-1611, 2022 WL 2834743, at*3 (N.D. Ohio July 20, 2022) ("An injunction ordinarily cannot be imposed on a non-party that has not had the opportunity to contest its liability." (cleaned up)). Accordingly, the Court lacks subject-matter jurisdiction to entertain the equitable relief Plaintiffs' motion demands. *TransUnion*, 594 U.S. at 423. So the TRO motion fails out of the gate.

But that is not the sole jurisdictional problem; the *Rooker-Feldman* doctrine also comes into play. The doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Abbot v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (cleaned up). Plaintiffs' theory, as raised here in multiple counts of the Complaint (the bankruptcy stay count, the Dodd-Frank

12

count, and the fraud count), is that HSBC's attempt to obtain possession of the Hazelhurst property is improper because HSBC never validly obtained title during the state court foreclosure proceedings. (*See* Doc. 3, #17–24). But granting relief to Plaintiffs on such grounds would necessarily require the Court to hold "that the state court was wrong, [which] is difficult to conceive [of] … as, in substance, anything other than [a request for this Court to entertain] a prohibited appeal of the state-court judgment." *Tropf v. Fid. Nat'l Title Ins. Co.*, 289 F.3d 929, 937 (6th Cir. 2002) (citation omitted). Hence, it is of no import that Plaintiffs do not expressly attempt to appeal or to invoke the state court foreclosure judgment. (Reply, Doc. 9, #49–50). Form does not matter, here—just substance. And in substance, Plaintiffs' "federal claims are [] predicated on their conviction that the state courts were wrong [about HSBC's entitlement to take possession of its home]—the very definition of [claims] 'inextricably intertwined'" with the merits of the state court judgment. *Tropf*, 289 F.3d at 938. After all, that is the only means by which they can deign to ask this Court to "enjoin[] [HSBC's taking] … possession of [its] home under the federal statutes cited." (Doc. 9, #49).

*Rooker-Feldman* bars such an implicit appeal of the state court judgment. The short of it is that the Court lacks the power to operate as an appellate court that reviews state court judgments. So if Plaintiffs believe that the state court erred in permitting HSBC to obtain title to the Hazelhurst property, they must pursue that belief in the state court—not here. *Id.* at 937–38 (holding that a challenge to the

validity of a warranty deed alleged to be fraudulent was barred by *Rooker-Feldman*

given the deed's validity was upheld in state court proceedings).

Beyond that, the Anti-Injunction Act also bars the requested TRO. Under the

Act, "[a] court of the United States may not grant an injunction to stay proceedings

in a State court except as expressly authorized by Act of Congress, or where necessary

in aid of its jurisdiction, or to protect or [to] effectuate its judgments." 28 U.S.C.

§ 2283. On first blush, it may seem odd to describe a Sheriff's acting pursuant to a

state court's contempt order as a "proceedings in a State court." But the Supreme

Court has interpreted the term quite broadly, such that even the Sheriff's actions

here are covered by the Anti-Injunction Act:

> That term is comprehensive. It includes all steps taken or which may be
> taken in the state court or by its officers from the institution to the close
> of the final process. It applies to appellate as well as to original
> proceedings; and is independent of the doctrine of res judicata. It applies
> alike to action by the court and by its ministerial officers; applies not
> only to an execution issued on a judgment, but to any proceeding
> supplemental or ancillary taken with a view to making the suit or
> judgment effective. The prohibition is applicable whether such
> supplementary or ancillary proceeding is taken in the court which
> rendered the judgment or in some other.

*Hill v. Martin*, 296 U.S. 393, 403 (1935). Here, the Sheriff, armed with the contempt

order to evict Plaintiffs from their home, is effectuating the state court's foreclosure

judgment. *Cf. Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287

(1970) (noting "[i]t is settled that the prohibition of § 2283 cannot be evaded

by … prohibiting utilization of the results of a completed state proceeding"). As that

ancillary "execution issued on a judgment … taken with a view to making

the … judgment effective" falls within the capacious definition of a 'proceedings in a

14

State court' set forth in *Hill*, the Anti-Injunction Act bars the TRO, unless one of the three enumerated exceptions applies. 296 U.S. at 403.

None does. As HSBC rightly points out, (Opp'n, Doc. 8, #38–39), neither the motion nor the Complaint identifies legal authority permitting this Court's enjoining state court proceedings—indeed, the motion (other than generally to refer back to the Complaint) cites no legal authority at all, (*see* Doc. 2). True, Plaintiffs belatedly claim that, because RICO claims may generally be remedied with injunctive relief, that means Congress expressly authorized federal courts to issue injunctions against state courts under that statute. (Doc. 9, #50–51). But two problems with that. First, the argument is too late to the party and therefore need not be considered. *SAT Tech., Inc. v. CECO Env't Corp.*, No. 1:18-cv-907, 2023 WL 6119934, at *3 n.7 (S.D. Ohio Sept. 19, 2023). Second, the Sixth Circuit has previously suggested that this argument does not work. It did so by noting in a civil RICO action challenging the validity of certain conveyances of property that "there is no statute that particularly authorizes the federal courts to issue injunctions in the circumstances of this case." *Tropf*, 289 F.3d at 942 n.21. If the civil RICO statute did not meet the Anti-Injunction Act exception there, little reason exists to believe it would here. And this makes sense. Plaintiffs merely point to the availability of injunctive relief generally under RICO. But that does not answer the more specific and relevant question here, which is whether the statute specifically authorizes injunctions that are *directed against state court proceedings*. The latter need not and does not follow from the former. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 636 (1977) (noting that "the importance of the

15

federal policy to be protected by the injunction is not the focus of the inquiry" (citation omitted)). And as the standard for a statute to authorize such injunctions expressly requires substantial evidence of congressional authorization by reference to the statute's text and historical enactment, *id.* at 631–34 (highlighting the unique attributes of 42 U.S.C. § 1983 that make it a prime candidate for the "expressly authorized" exception that is not evident from the lack of textual authorization and historical support for the same authorization in the Clayton Act), the authority to grant equitable relief alone cannot be the basis for the application of this exception. *Id.* at 641 (concluding that a statute that "does not by its very essence contemplate or envision any necessary interaction with state judicial proceedings, is clearly not [] an Act" that fits within the "expressly authorized" exception to the Anti-Injunction Act).

Moving to the second exception, there is no prior federal court judgment to protect or to effectuate. *Huguley v. Gen. Motors Corp.*, 999 F.2d 142, 145 (6th Cir. 1999) (noting the "protect or effectuate" exception applies to "prior federal court judgments"). To the contrary, the myriad federal cases identified above, *see supra* note 2, all ended unfavorably to Dates. And finally, the Court need not issue an injunction to aid this Court's jurisdiction as this is an in personam action against HSBC, not an in rem action regarding the Hazelhurst property. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 38 F.4th 501, 505–06 (6th Cir. 2022); *cf. GP Vincent II v. Est. of Edgar Beard*, 68 F.4th 508, 519, 523 (9th Cir. 2023) (Bea, J., concurring in the judgment) (explaining the in rem versus in personam distinction).

16

Moreover, even if the Court somehow could clear these threshold hurdles, Plaintiffs fare no better on the merits of their specific claims. Perhaps most notably, res judicata, now more commonly called claim preclusion, bars their claims. Claim preclusion holds that a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Fed. Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). As noted above, the state court entered a judgment in the foreclosure action in 2014 finding that HSBC held a valid mortgage and an order in 2019 affirming the property's sale to HSBC as the current titleholder. Plaintiffs' claims attempting to (re)litigate the validity of the mortgage, (*e.g.*, Doc. 9, #53–54), could have easily been raised in that proceeding—yet, Dates instead has attempted to do so several times over in this Court and the bankruptcy court to no avail. As the undersigned noted in an appeal from one of the previous bankruptcy filings,

> [t]he validity of the underlying lien at issue here (which resulted from a mortgage) was determined by an Ohio state court. … [T]hat earlier foreclosure judgment precludes Dates' later efforts to relitigate that same issue in her bankruptcy proceedings. The … resolution of that issue in connection with her fourth bankruptcy action appears to this Court to be just as correct as when the bankruptcy court reached that same result, on that same issue, in her second bankruptcy action.

*Dates XV*, 2020 WL 7253301, at *7. And the passage of another three years does not (and cannot) change that result. So there is no basis for Dates now to re-raise claims that she could have made in resisting the state court judgment in the first instance.

17

Nor is there any basis for her to re-raise claims that she could have asserted in previous federal actions.[4]

Given the many problems the Court already has identified, the Court declines to tread much further. That said, the Court would be remiss if it did not note the clearly evident problems with the conclusory allegations in the Dodd-Frank and RICO counts of the Complaint. (Doc. 3, #22–23). These claims appear to consist only of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *see also supra* note 3. Whether or not as such they could survive a motion to dismiss is a question for another day. But for present purposes, suffice to say that they do not provide the Court a strong basis—

---

[4] Just as Plaintiffs' challenge to who properly holds title to the Hazelhurst property is barred by the state court foreclosure judgment under the doctrine of res judicata, so too are some of Dates's other claims connected to the property by the judgments entered in the several cases from her extensive federal court litigation history.

As the bankruptcy court (correctly) held in Dates's most recent bankruptcy proceeding, HSBC still holds title even though it executed an April 17, 2020, Release of Mortgage. *Dates XVII*, 2024 WL 120028, at *7. "The Release of Mortgage released and reconveyed HSBC's mortgage interest 'to the persons legally entitled thereto.' At the time of the release, that 'person' was HSBC, holding legal title to the Hazelhurst Property pursuant to the Sheriff's Deed" recorded a year before. *Id.* (cleaned up). Dates cannot be heard to suggest she obtained title on account of HSBC's release of the mortgage to *itself* in order to create a clean title to the Hazelhurst property subject to no encumbrances. The Hazelhurst property is HSBC's, as it has been for nearly five years.

Similarly, despite Plaintiffs' continued insistence to the contrary, (Doc. 9, #51–52), no violation of the bankruptcy court stay could have occurred when HSBC initiated a Sheriff's sale of the Hazelhurst property in late 2018. The bankruptcy court rejected this spurious argument that Plaintiffs now rehash and offered the following observation: no automatic stay barred the sale as "HSBC had previously obtained in rem relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(4) in Case Number 18-13150 by order entered on October 9, 2018 and the relief granted was valid for a period of two years [Case Number 18-13150, Docket Number 26]." *Dates XVII*, 2024 WL 120028, at *7 n.7.

Simply, the repackaged Complaint counsel filed here fares no better than any of the other dozen-and-half uncounseled suits raising largely the same specious challenges.

18

and certainly not a clear and convincing basis—to conclude that Plaintiffs are likely to prevail on their action.

And beyond that there is the question of evidence generally. As noted above, a plaintiff seeking a TRO must provide an evidentiary basis supporting that request. *See Patel*, 2020 WL 5849346, at *4. Often, that comes in the form of a verified complaint, which amounts to an affidavit, as the plaintiff signs it under penalty of perjury. But the Complaint here is not verified, and thus is not evidence, as Plaintiffs' counsel conceded during argument. Nor have Plaintiffs attached any evidence to their motion, as counsel also conceded. That in turn means, as counsel also acknowledged, that the only evidentiary record before the Court is the previous litigation history, of which the Court can take judicial notice. But for all the reasons discussed above, the litigation history does not support (to put it mildly) Plaintiffs' request for a TRO. So even putting aside all of the legal problems noted above, Plaintiffs have abjectly failed to carry the evidentiary burden required to support their requested relief.

In sum, on a host of fronts, both substantive and procedural, the Court sees an array of deficiencies with the claims, the Complaint, and the TRO motion. The jurisdictional, pleading, res judicata, and merits problems (merits that have been litigated and relitigated in several forums), all point in one direction: Plaintiffs have not established any meaningful likelihood of success on their claims. And because the Complaint raises no serious questions going to the merits of the claims, the Court need not address any of the other preliminary injunction factors, as the apparently

spurious nature of Plaintiffs' claims in and of itself dooms any request for relief. *Frisch's*, 759 F.2d at 1270.

But the Court closes with a further observation on the balance of harms. Here it is granting the TRO that would cause harm, not denying it. HSBC has owned the Hazelhurst property for five years but has been denied possession for that entire time. The protection of property rights, like HSBC's, is an essential component of our constitutional legal structure. *See* U.S. Const. amends. V, XIV. Any further delay occasioned by this Court would simply add to HSBC's costs and the harm it has suffered to date.

And even that does not tell the whole story of the harm at issue here. Mortgage lenders provide money to support home purchases at favorable interest rates precisely *because* the lenders have a way to minimize their losses in the event of default. In the parlance of the banking industry, mortgage loans are said to be "secured," which simply means that the lender has access to a straightforward mechanism for repossessing the collateral (the home) in a relatively fast and efficient manner if the borrower stops paying. Because the availability of such relief reduces the risk accompanying such loans, that reduced risk is passed on to borrowers in the form of lower rates generally. But if parties like the Plaintiffs here are successful in turning the foreclosure process into a multi-year, multi-jurisdictional slog, then the value to the lender of the repossession right goes down, and the risk goes up. In turn, that means that interest rates for mortgage loans will rise across the board, as such

loans will be less "secure." And that means home purchasers will pay more for their mortgages.

Plaintiffs' only response on the harm front is to assert that: "Defendant is an international bank. How serious an injury could the ordering of a *temporary* stay be"? (Doc. 9, #53). At one level, Plaintiffs may be correct that HSBC, with its resources, could "afford" to let Dates remain in the house in some sense of that term. But remember that the "temporary stay" sought here is merely the latest installment in a series of events that have resulted in a roughly five-year delay in Plaintiffs' leaving the house after the sale was complete. And nothing before the Court suggests any reason that Plaintiffs should be subject to special property rules. So the question is not whether HSBC could absorb such a loss as to Dates, but rather whether it could absorb that type of loss as to all mortgage borrowers across the board. But that just leads directly to the point immediately above—when risks change, so do interest rates, and that outcome harms homeowners generally.

Does that mean that borrowers have no rights when lenders seek eviction? Of course not. Borrowers have due process rights to present any defenses they have to foreclosure or eviction in the foreclosure action itself, or even perhaps to file for bankruptcy protection, if they qualify, to stop those proceedings in their tracks. But here Dates has received due process, indeed oodles of process, with multiple suits in multiple courts, all largely re-plowing the same ground. It is just that she lost.

And that brings the Court to its final observation about harm, which is the harm that repetitive filings cause to the judicial system itself. A fundamental tenet

of the judicial process is that parties present all their arguments relating to a given matter to the first forum that has jurisdiction over a matter. And if a party disagrees with the resolution in that forum, the proper avenue for registering that disagreement is by way of an appeal. Parties have every right to disagree with a court's conclusion if they wish. Indeed, roughly fifty percent of the parties in any action tend to disagree with the court's resolution. And courts are by no means infallible. But parties cannot rely on their disagreement with a court's decision as a basis for simply ignoring court orders. Nor, except in very limited circumstances not present here, can they just proceed to file a new case in a new court system in hopes of obtaining a different answer than the one they already received.

## CONCLUSION

Over the past ten years, much ink has been spilled, and many trees felled, on a straightforward foreclosure proceeding and the long string of objections to that proceeding that Dates has repeatedly raised in multiple forums to no avail. That Dates now has counsel pressing those claims—or seeking to add new ones in support of Dates' previous efforts to prevent the state-court ordered eviction—does not change the outcome. Because the lack of any prospect for success on the merits of Plaintiffs' claims dooms the request for a TRO, the Court **DENIES** Plaintiffs' Motion for Temporary Restraining Order (Doc. 2).

**SO ORDERED.**

February 29, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

22